**Slip Op. 15-108**

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
:
THE FLORIDA TOMATO EXCHANGE,   :
:
       Plaintiff,   :
:
       v.   :
:
UNITED STATES,   :
:
       Defendant,   :
:
       and   :     Before: Richard K. Eaton, Judge
:
CAADES SINALOA, A.C., CONSEJO   :     Court No. 13-00148
AGRICOLA DE BAJA CALIFORNIA,   :
A.C., ASOCIACION MEXICANA DE   :
HORTICULTURA PROTEGIDA, A.C.,   :
UNION AGRICOLA REGIONAL DE   :
SONORA PRODUCTORES DE   :
HORTALIZAS FRUTAS Y   :
LEGUMBRES, and CONFEDERACION   :
NACIONAL DE PRODUCTORES DE   :
HORTALIZAS,   :
:
       Defendant-Intervenors.   :
_____:

**OPINION and ORDER**

[Plaintiff's motion for judgment on the agency record is granted, in part, and the case is remanded.]

Dated: September 24, 2015

     *Terence P. Stewart*, Stewart and Stewart, of Washington, DC, argued for plaintiff. With him on the brief were *Geert De Prest*, *Patrick J. McDonough*, and *Nicholas J. Birch*.

     *Mikki Cottet*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant. With her on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of counsel on the brief was *Rebecca Cantu*, Senior Attorney,

Office of Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

    *Thomas B. Wilner*, Shearman & Sterling LLP, of Washington, DC, argued for defendant-intervenors.  With him on the brief were *Robert S. LaRussa* and *Bryan Dayton*.

      EATON, Judge: This matter is before the court on plaintiff The Florida Tomato Exchange's (the "Tomato Exchange" or "plaintiff") USCIT Rule 56.2 motion for judgment on the agency record.  *See* Pl.'s Rule 56.2 Mot. for J. on the Agency R. (ECF Dkt. No. 30) ("Pl.'s Mot.").  Plaintiff is a trade association representing growers and first handlers of the domestic like product of the subject merchandise.[1]  *See* Summons ¶ 1 (ECF Dkt. No. 1).  By its motion, plaintiff challenges the United States Department of Commerce's ("Commerce" or the "Department") agreement with producers and exporters of the subject merchandise, defendant-intervenors CAADES Sinaloa, A.C., Consejo Agrícola de Baja California, A.C., Asociación Mexicana de Horticultura Protegida, A.C., Unión Agrícola Regional de Sonora Productores de Hortalizas Frutas y Legumbres, and Confederación Nacional de Productores de Hortalizas (collectively, "defendant-intervenors").  *See* Pl.'s Mot. 1–2.  Defendant-intervenors, each associations of Mexican producers and exporters of the subject merchandise, account for

---

[1]    The subject merchandise is described in the 2013 Suspension Agreement as follows:

> [A]ll fresh or chilled tomatoes (fresh tomatoes) which have Mexico as their origin, except for those tomatoes which are for processing. . . . [P]rocessing is defined to include preserving by any commercial process, such as canning, dehydrating, drying, or the addition of chemical substances, or converting the tomato product into juices, sauces, or purees.  Fresh tomatoes that are imported for cutting up, not further processing . . . are covered by this Agreement.
> . . . .
>     Tomatoes imported from Mexico covered by this investigation are classified under the following subheading of the Harmonized Tariff Schedules of the United States (HTSUS), according to the season of importation: 0702.

*Fresh Tomatoes From Mexico*, 78 Fed. Reg. 14,967, 14,967 (Dep't of Commerce Mar. 8, 2013) (suspension of antidumping investigation).

substantially all imports of fresh tomatoes from Mexico.  *See* Consent Mot. to Intervene as of

Right as Def.-Ints. 1–2 (ECF Dkt. No. 15).  The agreement suspends the antidumping duty

investigation on fresh tomatoes from Mexico entered into pursuant to 19 U.S.C. § 1673c(c)

(2012), published as *Fresh Tomatoes From Mexico*, 78 Fed. Reg. 14,967 (Dep't of Commerce

Mar. 8, 2013) (suspension of antidumping investigation) ("2013 Suspension Agreement").

The Tomato Exchange contests five aspects of the 2013 Suspension Agreement: (1)

Commerce's determination that the agreement would limit dumping to the extent required by the

statute; (2) Commerce's determination that the suspension agreement would prevent price

suppression and price undercutting; (3) Commerce's determination that the injurious effects of the

dumped imports would be eliminated; (4) Commerce's determination that the suspension

agreement would be more beneficial to the domestic industry than the continuation of the

investigation; and (5) Commerce's failure to comply with the notice, comment, and consultation

requirements of the suspension agreement statute before suspending the investigation.  *See* Pl.'s

Mem. of P. & A. in Supp. of its Mot. for J. on the Agency R. 1–2, 32 & n.14 (ECF Dkt. No. 30)

("Pl.'s Br.").  Plaintiff thus urges that the 2013 Suspension Agreement be remanded to Commerce

with instructions that it reconsider its determination to suspend the investigation and enter into the

2013 Suspension Agreement.  *See* Pl.'s Mot. 3.

Defendant, the United States, opposes plaintiff's motion and asks that the 2013

Suspension Agreement be sustained in full.  *See* Def.'s Mem. in Opp'n to Pl.'s Rule 56.2 Mot. for

J. on the Agency R. 2 (ECF Dkt. No. 42).  Defendant-intervenors join in opposition to plaintiff's

motion.  *See* Def.-Ints.' Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R. (ECF Dkt. No. 40)

("Def.-Ints.' Br.").  Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2012) and 19 U.S.C.

§ 1516a(a)(2)(A)(i)(I), (B)(iv).  For the reasons set forth below, Commerce's determination to

suspend the investigation and enter into the 2013 Suspension Agreement is remanded with

instructions to adhere to the notice, comment, and consultation requirements set forth in the

suspension agreement statute.  *See* 19 U.S.C. § 1673c(e).

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19

U.S.C. § 1516a(b)(1)(B)(i).

## LEGAL FRAMEWORK

Pursuant to 19 U.S.C. § 1673c(c), the Department is authorized, under limited

circumstances, to suspend an antidumping investigation by entering into a settlement agreement

with exporters "who account for substantially all of the imports of [subject] merchandise into the

United States." 19 U.S.C. § 1673c(c).  Such agreements are thus an atypical remedy in that they

are entered into with the foreign industry that a petitioner has asserted is making sales at less than

fair value into the United States, but neither the petitioner nor any industry representative is a

signatory to the agreement.  *See* S. Rep. No. 96-249, at 71 (1979), *reprinted in* 1979

U.S.C.C.A.N. 381, 457 ("[S]uspension is an unusual action which should not become the normal

means for disposing of cases.").  Congress, in providing for such agreements, intended that they

be used "as a means of achieving the remedial purposes of the [antidumping] law in as short a time

as possible and with a minimum expenditure of resources by all parties involved."  H.R. Rep. No.

96-317, at 63 (1979); *see also PPG Indus., Inc. v. United States*, 11 CIT 344, 355, 662 F. Supp.

258, 267 (1987) ("A separate investigation of [the exporter, Fomento Comercio Exterior,] would

have impermissibly expanded the scope and duration of the investigation and violated

congressional desire that suspension agreements lead to rapid resolution of the issues."), *aff'd*,

928 F.2d 1568 (Fed. Cir. 1991).  Nonetheless, as shall be seen, it was not Congress's intent that

the domestic industry should be a complete stranger to the proceedings leading up to the

execution of a suspension agreement or to efforts to continue or terminate it.

There are three[2] types of suspension agreements, the availability of each of which is

circumscribed by statute.  *See* 19 U.S.C. § 1673c(b), (c), (*l*).  The most common of these is an

agreement pursuant to 19 U.S.C. § 1673c(b) ("subsection (b) agreement"), by which all sales made

by exporters at less than fair value must be completely eliminated by the suspension agreement.[3]

*Id.* § 1673c(b).  In this case, however, Commerce entered into a second type of agreement found in

19 U.S.C. § 1673c(c) ("subsection (c) agreement").  Unlike subsection (b) agreements, subsection

(c) agreements need not eliminate dumping completely.  In order to enter into a subsection (c)

agreement, though, extraordinary circumstances must be present.  *Id.* § 1673c(c)(1).  The statute

defines "extraordinary circumstances" as those "in which . . . (i) suspension of an investigation

will be more beneficial to the domestic industry than continuation of the investigation, and (ii)

the investigation is complex."  *Id.* § 1673c(c)(2)(A).  An investigation is considered complex

when either "(i) there are a large number of transactions to be investigated or adjustments to be

---

[2]       Because Mexico is a market economy country, the special rule of 19 U.S.C. § 1673c(*l*) governing suspension agreements with nonmarket economy countries is not relevant here.  *See Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 27 CIT 1827, 1835 n.17 (2003); *Sichuan Changhong Elec. Co. v. United States*, 30 CIT 1481, 1510, 460 F. Supp. 2d 1338, 1363 (2006).

[3]       Under a subsection (b) agreement, which is not relevant here, exporters must agree to either cease exports of the subject merchandise altogether or completely eliminate sales of the subject merchandise at less than fair value to the United States.  *See* 19 U.S.C. § 1673c(b).

considered, (ii) the issues raised are novel, or (iii) the number of firms involved is large." *Id.*

§ 1673c(c)(2)(B).

Once the Department determines that extraordinary circumstances are present, it may

suspend the investigation under a subsection (c) agreement "upon the acceptance of an agreement

to revise prices from exporters of the subject merchandise who account for substantially all of the

imports of that merchandise into the United States." *Id.* § 1673c(c)(1).  Commerce may only enter

into a subsection (c) agreement if (1) "the agreement will eliminate completely the injurious effect

of exports to the United States of that merchandise," (2) "the suppression or undercutting of price

levels of domestic products by imports of that merchandise will be prevented,"[4] and (3) the

agreement ensures that,

> for each entry of each exporter the amount by which the estimated normal value
> exceeds the export price (or the constructed export price) will not exceed 15 percent
> of the weighted average amount by which the estimated normal value exceeded the
> export price (or the constructed export price) for all less-than-fair-value entries of
> the exporter examined during the course of the investigation.

*Id.*  In other words, to enter into a subsection (c) agreement, Commerce must be satisfied that the

agreement will eliminate at least 85 percent of dumping by finding that the dumping margin of

each entry will not exceed 15 percent of the weighted average dumping margin preliminarily

determined (1) for the exporter in the less-than-fair-value investigation that is to be suspended, or

---

[4]        Notably, these determinations are usually the province of the International Trade
Commission.  *See Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United
States*, 27 CIT 1827, 1839–40 (2003) ("The most convincing evidence that the reference price
utilized in the Suspension Agreement was not designed to eliminate the dumping margin,
however, is that it was arrived at by using none of the tools used in an antidumping case, i.e., a
fair comparison of the normal value and export price.  Rather, it was determined by reference to
a number representing 92% of 'the weighted-average of the honey unit import values from all
other countries.'  Subsection (b) agreements, by contrast, normally include provisions relating to
the establishment of normal value." (quoting *Honey From the People's Republic of China*, 60
Fed. Reg. 42,521, 42,524 (Dep't of Commerce Aug. 16, 1995) (suspension of investigation))),
*rev'd and remanded on other grounds*, 432 F.3d 1363 (Fed. Cir. 2005).

(2) the all-others rate in the case of exporters that were not selected for individual examination by

the Department.  Further, the Department may not enter into a suspension agreement of any kind

unless "(1) it is satisfied that suspension of the investigation is in the public interest, and (2)

effective monitoring of the agreement by the United States is practicable." *Id.* § 1673c(d).

Importantly, before an investigation may be suspended, the Department must "notify the

petitioner [in the investigation] of, and consult with the petitioner concerning, its intention to

suspend the investigation, and notify other parties to the investigation and the [International

Trade Commission ('ITC' or 'Commission')] not less than 30 days before the date on which it

suspends the investigation." *Id.* § 1673c(e)(1).  In addition, Commerce must "provide a copy of

the proposed agreement to the petitioner at the time of the notification, together with an

explanation of how the agreement will be carried out and enforced, and of how the agreement

will meet the requirements of" the statute.  *Id.* § 1673c(e)(2).  Moreover, the Department must

"permit all interested parties . . . to submit comments and information for the record before the

date on which notice of suspension of the investigation is published," i.e., before the suspension

agreement goes into effect.  *Id.* § 1673c(e)(3).

Even after the suspension of the investigation, Commerce has responsibilities relating to

the suspension of an investigation and to the suspension agreement itself.  If the Department

receives a request for continuation of the investigation "within 20 days after the date of publication

of the notice of suspension of an investigation" from "exporters accounting for a significant

proportion of exports to the United States of the subject merchandise, or . . . an interested party . . .

which is a party to the investigation, then the [Department] and the Commission shall continue the

investigation." *Id.* § 1673c(g).  Following the suspension of an investigation, parties may request

an annual review by Commerce of "the current status of, and compliance with, any agreement by

reason of which an investigation was suspended, and review the amount of any net countervailable subsidy or dumping margin involved in the agreement." *Id.* § 1675(a)(1)(C).

Last, for subsection (c) agreements, interested parties are afforded an additional tool to secure compliance by the signatories with the terms of the agreement and to ensure that the agreement is achieving its intended goal of eliminating the injurious effects of exports to the United States of subject merchandise: "Within 20 days after the suspension of an investigation[,] . . . an interested party which is a party to the investigation . . . may, by petition filed with the Commission and with notice to the administering authority, ask for a review of the suspension." *Id.* § 1673c(h)(1).  Following the receipt of such a petition, the ITC "shall, within 75 days after the date on which the petition is filed with it, determine whether the injurious effect of imports of the subject merchandise is eliminated completely by the agreement." *Id.* § 1673c(h)(2).  Should the Commission make a negative determination, Commerce is directed to resume its investigation "on the date of publication of notice of such determination as if the affirmative preliminary determination . . . had been made on that date." *Id.*  Thus, the statutory scheme envisions an important and continuing role for the parties to an investigation in the period leading up to the execution of a suspension agreement and thereafter.

## BACKGROUND

In April 1996, following the receipt of an antidumping duty petition,[5] Commerce initiated an antidumping investigation to determine whether imports of fresh tomatoes from Mexico were being, or were likely to be, sold in the United States at less than fair value. *See Fresh Tomatoes*

---

[5]        Plaintiff was one of the six petitioners in these proceedings. *See Fresh Tomatoes From Mexico*, 61 Fed. Reg. 18,377, 18,377 (Dep't of Commerce Apr. 25, 1996) (initiation of antidumping duty investigation).

*From Mexico*, 61 Fed. Reg. 18,377, 18,377 (Dep't of Commerce Apr. 25, 1996) (initiation of

antidumping duty investigation).  Following the ITC's affirmative preliminary injury

determination, Commerce published a preliminary determination of its own on November 1, 1996,

finding that fresh tomatoes from Mexico were being sold at less than fair value in the United

States.  *Fresh Tomatoes From Mexico*, 61 Fed. Reg. 56,608, 56,608 (Dep't of Commerce Nov. 1,

1996) (notice of preliminary determination of sales at less than fair value and postponement of

final determination).  On that same day, Commerce finalized a subsection (c) suspension

agreement with Mexican producers and exporters, which accounted for substantially all[6] of the

United States imports of fresh tomatoes from Mexico, to suspend the investigation.  *See* Fresh

Tomatoes From Mexico, 61 Fed. Reg. 56,618, 56,618 (Dep't of Commerce Nov. 1, 1996)

(suspension of antidumping investigation) ("1996 Suspension Agreement").  To prevent price

suppression and price undercutting, the 1996 Suspension Agreement required each Mexican

grower and exporter that was a party to the agreement not to sell its fresh tomatoes below a single-

established reference price.[7]  *See* 1996 Suspension Agreement, 61 Fed. Reg. at 56,618.  The

agreement was amended in August 1998 to create two reference prices, distinguishing the price for

tomatoes sold during the summer season from the winter season.  *See Amendment to the*

---

[6]        Pursuant to Commerce's regulations,
exporters that account for "substantially all" of the merchandise means exporters
and producers that have accounted for not less than 85 percent by value or volume
of the subject merchandise during the period for which the Secretary [of
Commerce] is measuring dumping or countervailable subsidization in the
investigation or such other period that the Secretary [of Commerce] considers
representative.
19 C.F.R. § 351.208(c) (2012) (recodified from 19 C.F.R. § 353.18(c) (1995)).

[7]        A "reference price" is "a minimum price at which the signatories [to a suspension
agreement] c[an] sell subject merchandise in the United States."  *Fla. Tomato Exch. v. United
States*, 38 CIT __, __, 973 F. Supp. 2d 1334, 1336 (2014).

*Suspension Agreement on Fresh Tomatoes from Mexico*, 63 Fed. Reg. 43,674, 43,674–75 (Dep't of

Commerce Aug. 14, 1998).

Nearly ten years later, and after a second, modified suspension agreement was entered into

in 2002 and terminated thereafter, Commerce entered into a new suspension agreement with

Mexican growers and exporters on January 22, 2008. *See Fresh Tomatoes From Mexico*, 73 Fed.

Reg. 4,831, 4,831–32 (Dep't of Commerce Jan. 28, 2008) (suspension of antidumping

investigation) ("2008 Suspension Agreement").  The agreement maintained the reference prices

established in the previous agreement of $0.2169 per pound for the winter season (i.e., October 23

through June 30) and $0.172 per pound for the summer season (i.e., July 1 through October 22).

*Id.* at 4,836.

This agreement was in effect for over four years when, on June 22, 2012, domestic

producers accounting for more than 90 percent of the domestic industry[8] "filed a request for

withdrawal of the petition and termination of the [suspended] investigation and the suspension

agreement" based on changed circumstances.  *Fresh Tomatoes From Mexico*, 77 Fed. Reg. 60,103,

60,103 (Dep't of Commerce Oct. 2, 2012) (notice of preliminary results of changed circumstances

review and intent to terminate the suspended antidumping investigation).  In August 2012, the

Department determined that a changed circumstances review was warranted and provided notice

that it was initiating such a review.  *Fresh Tomatoes from Mexico*, 77 Fed. Reg. 50,554 (Dep't of

Commerce Aug. 21, 2012) (notice of initiation of changed circumstances review); *Correction:*

---

[8]         Those domestic producers included the Tomato Exchange (plaintiff), the Florida
Tomato Growers Exchange, the Florida Fruit and Vegetable Association, the Florida Farm
Bureau Federation, the Gadsden County Tomato Growers Association, Inc., the South Carolina
Tomato Association, Inc., and the Ad Hoc Group of Florida, California, Georgia, Pennsylvania,
South Carolina, Tennessee, and Virginia Tomato Growers.  *Fresh Tomatoes from Mexico*, 77
Fed. Reg. 50,554, 50,554 (Dep't of Commerce Aug. 21, 2012) (notice of initiation of changed
circumstances review).

*Fresh Tomatoes From Mexico*, 77 Fed. Reg. 50,556 (Dep't of Commerce Aug. 21, 2012) (notice of initiation of changed circumstances review and consideration of termination of suspended investigation).  As a result, certain Mexican signatories requested consultations with the Department pursuant to the terms of the 2008 Suspension Agreement, to which the Department agreed.  *See* Letter from Bryan Dayton, Shearman & Sterling LLP, Counsel for defendant-intervenors, to Hon. Rebecca M. Blank, Acting Secretary of Commerce, U.S. Department of Commerce, PD 77 at bar code 3092122-01 (Aug. 15, 2012), ECF Dkt. No. 54-77.

Between September 2012 and February 2013, Commerce and the Mexican industry met to discuss the issues of reference prices, signatory coverage, and enforcement of a new suspension agreement.  Following these consultations, a new suspension agreement was proposed and initialed by Commerce and the Mexican growers and exporters.  *See* 2013 Suspension Agreement, 78 Fed. Reg. at 14,967.  The proposed agreement was submitted to interested parties for comment between February 2, 2013 and February 11, 2013.  *See* Letter from Judith Wey Rudman, Director for Bilateral Agreements, Office of Policy, U.S. Department of Commerce, to All Interested Parties at 1, PD 4, at barcode 3117540-01 (Feb. 2, 2013), ECF Dkt. No. 54-1 ("Draft 2013 Suspension Agreement").  At the time it provided a draft of the suspension agreement to interested parties, however, Commerce did not make available its explanatory memoranda, which provided the specific details of how the agreement would be carried out and enforced.

On March 4, 2013, the Department and Mexican growers and exporters signed the new suspension agreement, thereby again suspending the investigation of fresh tomatoes, and on March 8, 2013, the Department announced the execution of the 2013 Suspension Agreement.  *See* 2013 Suspension Agreement, 78 Fed. Reg. at 14,967.  Unlike the 1996, 2002, and 2008 suspension agreements, the 2013 Suspension Agreement established both a summer season and winter season

reference price for four general types of tomatoes: (1) open field and adapted environment, other

than specialty (winter: $0.31 per pound; summer: $0.2458 per pound); (2) controlled environment,

other than specialty (winter: $0.41 per pound; summer: $0.3251 per pound); (3) specialty—loose[9]

(winter: $0.45 per pound; summer: $0.3568 per pound); and (4) specialty—packed (winter: $0.59

per pound; summer: $0.4679 per pound).  *See* 2013 Suspension Agreement, 78 Fed. Reg. at

14,972.

      On April 19, 2013, plaintiff filed this lawsuit, challenging Commerce's determination to

suspend the antidumping investigation on fresh tomatoes from Mexico and enter into the 2013

Suspension Agreement.  *See* Compl. ¶ 1 (ECF Dkt. No. 7).  On January 31, 2014, the Tomato

Exchange moved to strike certain exhibits and related arguments from defendant-intervenors'

brief, claiming that they were not presented to the Department in the underlying administrative

proceedings, were thus not part of the administrative record, and as a consequence, could not be

considered by the court.  *See* Pl.'s Mot. to Strike Portions of the Def.-Ints.' Br. 1 (ECF Dkt. No.

47).  Specifically, the exhibits and arguments that plaintiff sought to have stricken from defendant-

intervenors' brief, related to the Mexican producers and exporters' claim that the Tomato

Exchange was making arguments before the court that were contrary to the positions it had taken

in prior proceedings before the ITC and Commerce, and as a result, it should be judicially estopped

from making these arguments now before the court.  *See Fla. Tomato Exch. v. United States*, 38

CIT __, __, 973 F. Supp. 2d 1334, 1336 (2014).  The court denied plaintiff's motion to strike, but

did not reach the merits of whether plaintiff should be judicially estopped from presenting certain

arguments to the court.  *See id.* at __, 973 F. Supp. 2d at 1341.

---

[9]    For purposes of the 2013 Suspension Agreement, "specialty tomatoes include grape, cherry, heirloom and cocktail tomatoes."  2013 Suspension Agreement 78 Fed. Reg. at 14,972.

## DISCUSSION

### I.   THE DOCTRINE OF EXHAUSTION OF ADMINISTRATIVE REMEDIES DOES NOT APPLY

In an argument related to that made in its motion to strike, defendant-intervenors assert

that plaintiff failed to exhaust its administrative remedies with respect to certain claims that the

Tomato Exchange makes in its brief before the court.  Defendant-intervenors maintain that the

Tomato Exchange failed to present its arguments during the comment period on the draft of the

2013 Suspension Agreement and is consequently barred from presenting these arguments now

before the court.  *See* Def.-Ints.' Br. 29.

Specifically, the Mexican producers and exporters contend that the Tomato Exchange

failed to argue before Commerce that: (1) the 2013 Suspension Agreement was not more

beneficial to the domestic industry than the continuation of the investigation; (2) the established

reference prices would not prevent price suppression or price undercutting; and (3) the 2013

Suspension Agreement would not eliminate the injurious effects of imports of the subject

merchandise into the United States.  *See* Def.-Ints.' Br. 28–29, 37–38.  Before the court,

defendant-intervenors renew their claims, arguing that, with respect to these arguments, plaintiff

failed to exhaust its administrative remedies.

A court "shall, where appropriate, require the exhaustion of administrative remedies."  28

U.S.C. § 2637(d); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381

(Fed. Cir. 2013).  "Exhaustion can 'serve judicial efficiency . . . by giving an agency a full

opportunity to correct errors and thereby narrow or even eliminate disputes needing judicial

resolution.'"  *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 38 CIT __, __, 968 F. Supp.

2d 1255, 1265 (2014) (alteration in original) (quoting *Itochu Bldg. Prods. v. United States*, 733

F.3d 1140, 1145 (Fed. Cir. 2013)).  Thus, "[a]s a general matter, '[t]he exhaustion doctrine

requires a party to present its claims to the relevant administrative agency for the agency's

consideration before raising these claims to the [c]ourt.'" *Hebei Metals & Minerals Imp. & Exp.*

*Corp. v. United States*, 28 CIT 1185, 1195 (2004) (alteration in original) (quoting *Timken Co. v.*

*United States*, 26 CIT 434, 459, 201 F. Supp. 2d 1316, 1340 (2002)).

    Therefore, where, as here, a party "fail[s] to present [an] issue during the applicable

comment period," it is normally "precluded from raising this issue *de novo* before the court."

*AIMCOR v. United States*, 141 F.3d 1098, 1111 (Fed. Cir. 1998) (citations omitted).  This rule,

though, is subject to "[c]ertain exceptions[,] . . . such as where . . . [a] party 'had no opportunity'

to raise the issue before the agency." *See Yangzhou*, 716 F.3d at 1381 (quoting *Jiaxing Brother*

*Fastener Co. v. United States*, 34 CIT 1455, 1466, 751 F. Supp. 2d 1345, 1356 (2010)).  In other

words, a party cannot be said to have failed to exhaust its administrative remedies if it was never

given a chance to be heard.  Moreover, when Commerce has failed to provide information to a

party that it is directed by statute to provide, and that is necessary for that party to make its case,

it cannot be said that the party has been afforded a true opportunity to be heard.

    Pursuant to 19 U.S.C. § 1673c(e)(1), the Department must "notify the petitioner of, and

consult with the petitioner concerning, its intention to suspend the investigation, and notify other

parties to the investigation and the Commission not less than 30 days before the date on which it

suspends the investigation." 19 U.S.C. § 1673c(e)(1).  "[A]t the time of the notification," i.e.,

"not less than 30 days before the date on which it suspends the investigation," the Department

must also "provide a copy of the proposed agreement to the petitioner[,] . . . together with an

explanation of how the agreement will be carried out and enforced, and of how the agreement

will meet the requirements of" the statute.  *Id.* § 1673c(e)(1), (2).  In addition, the Department is

required to "permit all interested parties . . . to submit comments and information for the record

before the date on which notice of suspension of the investigation is published." *Id.*

§ 1673c(e)(3).

These requirements, of course, are designed to give both foreign and domestic producers

an opportunity to be heard prior to a suspension agreement taking effect.  Indeed, the legislative

history of the statute emphasizes the importance of the notice, comment, and consultation

requirements, and that Commerce's failure to adhere to these directives does not constitute an

excusable procedural defect: "[T]he *requirement* that the petitioner be consulted will not be met

by pro forma communications.  Complete disclosure and discussion is *required*."  S. Rep. No.

96-249, at 71, *reprinted in* 1979 U.S.C.C.A.N. at 457 (emphases added).  The importance of

these requirements is underscored by Congress's concern that suspension "not become the

normal means for disposing of cases," and be used "only when [it] serves the interest of the

public and the domestic industry affected."  S. Rep. No. 96-249, at 71, *reprinted in* 1979

U.S.C.C.A.N. at 457.  It was then clearly the intent of Congress that the Department alert the

petitioner and the domestic industry of any proposed suspension agreement so that Commerce

might verify whether its determination that suspension of the investigation is in the best interests

of the public and domestic industry was correct.  Doing so would require Commerce to comply

with the notice, comment, and consultation requirements provided for by 19 U.S.C. § 1673c(e)

before signing the suspension agreement.

Here, although on February 2, 2013, in accordance with 19 U.S.C. § 1673c(e)(1),

Commerce provided petitioners[10] a copy of the proposed 2013 Suspension Agreement thirty days

before suspending the investigation, and provided them with an opportunity to comment on the

---

[10]     Although the statute directs that Commerce need only provide a draft of the proposed suspension agreement to the petitioner, the Department made the proposed agreement available to all interested parties.  *See* Draft 2013 Suspension Agreement at 1.

proposed agreement, the Department did not comply with the requirements of § 1673c(e)(2) and

(3).  *See* Draft 2013 Suspension Agreement at 1.  This is because, in addition to making available

to the petitioners a draft of the proposed suspension agreement prior to suspending the

investigation, § 1673c(e)(2) required Commerce to also provide the petitioners with its

explanation of how the agreement would be carried out and enforced, as well as how it satisfied

the provisions of the suspension agreement statute.  *See* 19 U.S.C. § 1673c(e)(2) ("Before an

investigation may be suspended under subsection . . . (c) of this section the administering

authority shall . . . provide a copy of the proposed agreement to the petitioner at the time of the

notification, *together with an explanation* of how the agreement will be carried out and enforced,

and of how the agreement will meet the requirements of subsections . . . (c) and (d) of this

section . . . ." (emphasis added)).

          Although they were not timely provided to the petitioners, Commerce prepared three

primary explanatory memoranda.  *See* Mem. from Lynn Fischer Fox, Deputy Assistant Secretary

for Policy and Negotiations, U.S. Department of Commerce, to Paul Piquado, Assistant

Secretary for Import Administration, U.S. Department of Commerce at 1, PD 26, at bar code

3122199-01 (Mar. 4, 2013), ECF Dkt. No. 54-26 ("Extraordinary Circumstances Mem."); Mem.

from Lynn Fischer Fox, Deputy Assistant Secretary for Policy and Negotiations, U.S.

Department of Commerce, to Paul Piquado, Assistant Secretary for Import Administration, U.S.

Department of Commerce at 1, PD 25, at bar code 3122195-01 (Mar. 4, 2013), ECF Dkt. No. 54-

25 ("Public Interest Mem."); Mem. from Lynn Fischer Fox, Deputy Assistant Secretary for

Policy and Negotiations, U.S. Department of Commerce, to Paul Piquado, Assistant Secretary

for Import Administration, U.S. Department of Commerce at 3, PD 75, at bar code 3130846-01

(Apr. 18, 2013), ECF Dkt. No. 54-75 ("Price Suppression & Undercutting Mem.").  These

memoranda addressed: (1) Commerce's determination that "extraordinary circumstances" were

present (i.e., Commerce's findings that (i) suspension of the investigation would be more

beneficial to the domestic industry than continuation of the investigation, and (ii) the

investigation was complex); (2) Commerce's determination that suspension of the investigation

was in the public interest; (3) the "enforcement elements on the U.S. side of the border," as well

as the "enforcement mechanisms on the Mexican side of the border," as provided for by the

suspension agreement; and (4) "the prevention of price suppression or undercutting of price

levels based on the reference prices contained in the 2013 [Suspension] Agreement," which

included, among other things, Commerce's interpretation of the suspension agreement statute

(specifically, 19 U.S.C. § 1673c(c)(1)(A)) and Commerce's calculations used to derive the

reference prices established in the agreement.  *See* Extraordinary Circumstances Mem. 1–2;

Public Interest Mem. at 1–2; Price Suppression & Undercutting Mem. at 1–3.

On March 4, 2013, the Department suspended the investigation, and on March 8, 2013,

the Department announced the execution of the 2013 Suspension Agreement, which suspended

the antidumping investigation.  *See* 2013 Suspension Agreement, 78 Fed. Reg. at 14,967.  The

Department took this action even though two of the three explanatory memoranda detailing

Commerce's determinations and explanations for entering into the 2013 Suspension

Agreement—Commerce's Extraordinary Circumstances Memorandum and its Public Interest

Memorandum—were not made available to the Tomato Exchange and the other petitioners until

the day after Commerce suspended the investigation (i.e., March 5, 2013).  Hence, these two

memoranda were provided to the petitioners thirty-one days after the latest date on which

Commerce was required to make its explanations available to them.  *See* 19 U.S.C.

§ 1673c(e)(2).  The third memorandum—Commerce's Price Suppression & Undercutting

Memorandum—was not finalized until April 18, 2013, forty-five days after the investigation had

been suspended and seventy-five days after the latest date on which the Department was required

to make the explanatory memoranda available.  Thus, it is apparent that Commerce did not

comply with the notice provision necessary for it to consider any of plaintiff's and the other

petitioners' objections before suspending the investigation, because the explanations of how the

agreement would be carried out, enforced, and satisfy the statutory requirements were not made

available by the Department until after the investigation was suspended.  *See id.* § 1673c(e).

More specifically, it failed to provide plaintiff and the other petitioners with copies of its

memoranda detailing how the agreement would be carried out and enforced at least thirty days

before suspending the investigation.  *See id.* § 1673c(e)(2).

　　　Congress recognized that suspension agreements were to be used sparingly, and provided

for subsection (c) agreements, in particular, to be "accepted only in extraordinary circumstances.

That is to say, rarely."  *See* S. Rep. No. 96-249, at 71, *reprinted in* 1979 U.S.C.C.A.N. at 457.

The notice, comment, and consultation requirements were designed with the purpose in mind of

ensuring that the petitioners, although not a party to any signed suspension agreement, be given

full disclosure with respect to the specific terms of the agreement, so that they could protect

themselves by raising objections with Commerce and building the record with relevant

information favoring their interests.  In other words, these safeguards were put in place by

Congress for the purpose of protecting the affected domestic industry and ensuring that their

interests be meaningfully considered by the Department before reaching a determination as to

whether to enter into a suspension agreement with a foreign industry.  As noted, the notice,

comment, and consultation requirements of the suspension agreement statute are mandatory and

were intended by Congress to be strictly adhered to.  *See* S. Rep. No. 96-249, at 71, *reprinted in*

*1979* U.S.C.C.A.N. at 457 ("[T]he *requirement* that the petitioner be consulted will not be met

by pro forma communications.  Complete disclosure and discussion is *required*." (emphases

added)).  Thus, it is clear that plaintiff and other interested parties were deprived of the

procedural rights afforded to them by the statute.

 Because each of the explanatory memoranda containing Commerce's reasons for how the

agreement would be carried out, enforced, and satisfy the statutory requirements were not made

available to the petitioners (and thus plaintiff) until after Commerce suspended the investigation,

and were thus not made available to them within the statutorily-prescribed time limit (i.e., not

less than thirty days before the date of the suspension), neither plaintiff nor other interested

parties had the opportunity to comment or object to specific aspects of the determinations made

therein before Commerce suspended the investigation.  Accordingly, because plaintiff did not

have a fair opportunity to be heard and challenge these issues at the administrative level, the

exhaustion doctrine does not apply.


## II.   COMMERCE'S FAILURE TO COMPLY WITH THE STATUTE'S NOTICE, COMMENT, AND CONSULTATION REQUIREMENTS COMPELS REMAND

 Plaintiff argues that Commerce's failure to adhere to the statutory notice, comment, and

consultation requirements set forth in 19 U.S.C. § 1673c(e) "provides an independent ground for

remand."  *See* Pl.'s Br. 32 n.14.  That is, according to plaintiff, because Commerce's explanatory

memoranda, which provided the explanations and methodologies underlying its determination to

enter into the 2013 Suspension Agreement, were not made available to plaintiff and other

petitioners prior to the suspension of the investigation, the Tomato Exchange had no occasion to

raise any objections to the proposed agreement, thereby depriving it of procedural rights afforded

to it by the suspension agreement statute.  *See* Pl.'s Br. 32 n.14.  The court agrees and holds that

the Department's procedural error warrants a remand of this case to Commerce.

Commerce's failure to comply with the statute compels two related holdings.  First,

because of Commerce's failure to provide petitioners and thus plaintiff copies of its explanatory

memoranda prior to suspending the investigation, the Tomato Exchange had no occasion to

challenge any aspect before Commerce.  Therefore, it may raise any arguments it might have

before the court.  Second, it is clear that Commerce's failure to comply with the notice,

comment, and consultation requirements of the statute has also deprived plaintiff and other

interested parties of essential procedural rights, thereby warranting a remand of this case to

Commerce to meaningfully consider the views of the domestic industry.  As noted, the notice,

comment, and consultation requirements of 19 U.S.C. § 1673c(e) are mandatory, not permissive.

Thus, Commerce's failure to "provide . . . the petitioner . . . with an explanation of how the

agreement will be carried out and enforced, . . . and of how the agreement will meet the

requirements of subsections . . . (c) and (d) of [the statute]" meant that Commerce failed to afford

interested parties an opportunity to comment and build the record before notice of suspension of

the investigation was published in the Federal Register.  *See* 19 U.S.C. § 1673c(e).

This failure deprived interested parties of the ability to comment on each of Commerce's

determinations dealing with the suspension agreement and build the record with further relevant

evidence supporting their position before notice of suspension of the investigation was

published.  *See id.* § 1673c(e)(3) ("Before an investigation may be suspended under subsection . .

. (c) of this section the administering authority shall . . . permit all interested parties described in

section 1677(9) of this title to submit comments and information for the record before the date on

which notice of suspension of the investigation is published under subsection (f)(1)(A) of this

section.").  In other words, although interested parties were afforded the opportunity to comment

on the proposed agreement, they had no occasion to comment on the explanations of how the

suspension agreement would be carried out and enforced, which were detailed only in the

explanatory memoranda.  As a result, Commerce did not have an opportunity to consider many

of the arguments made by plaintiff now before the court for the first time, and to which

defendant-intervenors object, and make any resulting corrections to the agreement.

      While it might be that the court could hear plaintiff's claims for the first time in this

appeal, the better course is for this matter to be remanded to the Department.  Indeed, the same

principle underlying the exhaustion requirement, which requires parties to first present their

arguments to the administrative agency before making them in court, applies to the notice,

comment, and consultation requirements of the suspension agreement statute:

> It allows the administrative agency to perform the functions within its area of
> special competence (to develop the factual record and to apply its expertise),
> and—at the same time—it promotes judicial efficiency and conserves judicial
> resources, by affording the agency the opportunity to rectify its own mistakes
> (and thus to moot controversy and obviate the need for judicial intervention).

*Qingdao Sea-line Trading Co. v. United States*, 36 CIT __, __, Slip Op. 12-39, at 40 (2012)

(citations omitted) (internal quotation marks omitted).  Remand will afford plaintiff an

opportunity to present its claims to Commerce that: (1) the 2013 Suspension Agreement was not

more beneficial to the domestic industry than the continuation of the investigation; (2) the

established reference prices would not prevent price suppression or price undercutting; (3) the

2013 Suspension Agreement would not eliminate the injurious effects of imports of the subject

merchandise into the United States; and (4) allow them to make any other objections pertaining

to Commerce's determinations that (i) extraordinary circumstances were present, (ii) suspension

of the investigation was in the public interest and could be monitored effectively, and (iii) the

2013 Suspension Agreement would prevent price suppression and price undercutting of domestic

prices by the subject merchandise.

## CONCLUSION and ORDER

For the foregoing reasons, it is hereby

ORDERED that the case is remanded; it is further

ORDERED that, on remand, Commerce shall issue a redetermination that complies in all

respects with this Opinion and Order, is based on determinations that are supported by

substantial record evidence, and is in all respects in accordance with law; it is further

ORDERED that, on remand, Commerce shall comply with the notice, comment, and

consultation requirements of 19 U.S.C. § 1673c(e); it is further

ORDERED that, on remand, Commerce shall comply with 19 U.S.C. § 1673c(e)(3) and

afford plaintiff an opportunity to comment on the Department's determinations and explanations

contained in its Extraordinary Circumstances Memorandum, Public Interest Memorandum, and

Price Suppression & Undercutting Memorandum; it is further

ORDERED that, on remand, Commerce shall reopen the record to permit plaintiff to

submit information for the record with any comments regarding the three explanatory

memoranda; it is further

ORDERED that, on remand, Commerce shall undertake any further consultation with

plaintiff that may be appropriate; it is further

ORDERED that, in light of any received comments and consultations, Commerce give

meaningful consideration of plaintiff's arguments, make any appropriate revisions to the 2013

Suspension Agreement, provide an explanation for any such revisions, and further document in

detail its consideration of any comments received by plaintiff and consultations held with the

Tomato Exchange; and it is further

      ORDERED that the remand results shall be due on February 24, 2016; comments to the

remand results shall be due thirty (30) days following filing of the remand results; and replies to

such comments shall be due fifteen (15) days following filing of the comments.

Dated:        September 24, 2015
           New York, New York


                       /s/ Richard K. Eaton
                       Richard K. Eaton