Slip Op. 17–114

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| THE FLORIDA TOMATO EXCHANGE, | : |
| Plaintiff, | : |
| v. | : |
| UNITED STATES, | : |
| Defendant, | : |
| and | : |
| CAADES SINALOA, A.C., CONSEJO AGRÍCOLA DE BAJA CALIFORNIA, A.C., ASOCIACIÓN MEXICANA DE HORTICULTURA PROTEGIDA, A.C., UNIÓN AGRÍCOLA REGIONAL DE SONORA PRODUCTORES DE HORTALIZAS FRUTAS Y LEGUMBRES, and CONFEDERACIÓN NACIONAL DE PRODUCTORES DE HORTALIZAS, | : |
| Defendant-Intervenors. | : |

Before: Richard K. Eaton, Judge

Court No. 13-00148

## OPINION and ORDER

[United States Department of Commerce's Remand Results are remanded.]

Dated: August 25, 2017

*Terence P. Stewart*, Stewart and Stewart, of Washington, DC, argued for plaintiff. With him on the brief were *Geert De Prest* and *Nicholas J. Birch*.

*Mikki Cottet*, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of Counsel on the brief was *Henry J. Loyer*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Thomas B. Wilner* and *David L. Earnest IV*, Shearman & Sterling LLP, of Washington, DC, argued for defendant-intervenors. With them on the brief was *Robert S. LaRussa.*

Eaton, Judge: This case involves a determination by the United States Department of Commerce ("Commerce" or the "Department") to enter into a suspension agreement with exporters of fresh tomatoes from Mexico to "eliminate completely the injurious effect of exports to the United States of the subject merchandise," pursuant to 19 U.S.C. § 1673c(c) (2012).[1] *Fresh Tomatoes From Mexico: Suspension of Antidumping Investigation*, 78 Fed. Reg. 14,967, 14,968 (Dep't Commerce Mar. 8, 2013) ("2013 Suspension Agreement" or "2013 Agreement"). In *Florida Tomato Exchange v. United States*, 39 CIT __, 107 F. Supp. 3d 1342 (2015) ("*Tomato Exchange I*"), the court held that Commerce had failed to comply with the notice, comment, and consultation requirements of 19 U.S.C. § 1673c(e) prior to entering into the 2013 Suspension Agreement, and remanded to Commerce.

Before the court are Commerce's final results of redetermination following remand. *See* Final Results of Redetermination Pursuant to Court Remand, ECF No. 84-1, P.R. 62-65 at bar code 3476104-01 to -04 ("Remand Results"). During remand proceedings, Commerce provided interested parties with notice, and an opportunity for comment and consultations, regarding certain Department memoranda whose purpose was to explain the bases for its determination that the 2013 Agreement would eliminate completely the injurious effect of imports of the Mexican tomatoes. In the Remand Results, Commerce continued to determine that the agreement met the requirements of 19 U.S.C. § 1673c(c).

---

[1]     Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition, and any applicable supplements.

Plaintiff the Florida Tomato Exchange[2] ("plaintiff" or the "Tomato Exchange") challenges, as unsupported by substantial evidence or otherwise not in accordance with law, several of Commerce's determinations on remand, including (1) that the 2013 Agreement will limit dumping to the level permitted by statute; and (2) that the agreement will prevent price suppression or undercutting and thereby eliminate completely the injurious effect of the subject imports. Plaintiff asks the court to again remand this matter to Commerce with instructions either to comply with subsection 1673c(c)'s requirements or to terminate the 2013 Suspension Agreement. *See* Pl.'s Cmts. Opp'n Final Results of Redetermination on Remand, ECF No. 86 ("Pl.'s Cmts.") 1-3.

The United States ("defendant"), on behalf of Commerce, argues that the Remand Results are supported by substantial evidence and otherwise in accordance with law. *See* Def.'s Resp. Cmts. Remand Redetermination, ECF No. 96 ("Def.'s Resp. Cmts."). Defendant-intervenors CAADES Sinaloa, A.C., *et al.*[3] (collectively, "defendant-intervenors"), the Mexican signatories to the 2013 Agreement, join the defendant in urging the court to sustain the Remand Results. *See* Def.-Int.'s Mem. Supp. Def.'s Final Results of Redetermination, ECF No. 90.

---

[2]    The Florida Tomato Exchange is "a trade association representing growers and first handlers of the domestic like product of the subject merchandise." *Tomato Exchange I*, 39 CIT at __, 107 F. Supp. 3d at 1344.

[3]    Defendant-intervenors CAADES Sinaloa, A.C., Consejo Agrícola de Baja California, A.C., Asociación Mexicana de Horticultura Protegida, A.C., Unión Agrícola Regional de Sonora Productores de Hortalizas Frutas y Legumbres, and Confederación Nacional de Productores de Hortalizas represent producers and exporters in Mexico that account for substantially all of the subject tomatoes imported into the United States. *See* 2013 Suspension Agreement, Section II (U.S. Import Coverage).

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012), and 19 U.S.C. § 1516a(a)(2)(B)(iv). For the reasons set forth below, the court remands this matter to Commerce.

## LEGAL FRAMEWORK

Commerce is authorized, under limited circumstances, to suspend an antidumping investigation by entering into a suspension agreement with exporters and producers of particular merchandise, or a foreign government.[4] Generally, suspension agreements are entered into where Commerce has made an affirmative preliminary dumping determination. *See* 19 C.F.R. § 351.208(f)(1)(i)(A) (2012) (proposed suspension agreement must be submitted to Commerce within 15 days of the preliminary determination); *id.* § 351.208(g)(1)(i) (Commerce may accept a suspension agreement within 60 days of issuance of a preliminary determination). "[I]n a suspension agreement, the exporters and producers or the foreign government agree to modify their behavior so as to eliminate dumping . . . or the injury caused thereby." *Id.* § 351.208(a).

Suspension agreements are an atypical remedy in antidumping cases. *See* S. Rep. No. 96-249, at 71 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 457 ("[S]uspension is an unusual action which should not become the normal means for disposing of cases."). Congress, in providing for such agreements, intended that they be used "as a means of achieving the remedial purposes of the

---

[4]     *Compare* 19 U.S.C. § 1673c(b) (authorizing suspension upon the acceptance of an agreement to cease exports or revise prices from exporters of the subject merchandise "who account for substantially all of the imports of that merchandise" into the United States), *and* § 1673c(c)(1) (authorizing suspension if the "exporters of the subject merchandise who account for substantially all of the imports of that merchandise into the United States" agree to meet certain statutory requirements), *with* § 1673c(*l*)(1) (authorizing suspension of "an investigation . . . upon acceptance of an agreement with a nonmarket economy country to restrict the volume of imports into the United States of the merchandise under investigation," where certain criteria are met).

[antidumping] law in as short a time as possible and with a minimum expenditure of resources by all parties involved." H.R. Rep. No. 96–317, 96th Cong., 1st Sess. 53 (1979); *see also PPG Indus., Inc. v. United States*, 11 CIT 344, 355, 662 F. Supp. 258, 267 (1987), *aff'd*, 928 F.2d 1568 (Fed. Cir. 1991) (noting "congressional desire that suspension agreements lead to rapid resolution of the issues").

The availability of suspension agreements is circumscribed by statute. *See* 19 U.S.C. § 1673c(b), (c), (*l*).[5] The most common type is an agreement entered into pursuant to 19 U.S.C. § 1673c(b) ("subsection (b) agreement"), by which exporters that account for "substantially all" of the imports of subject merchandise into the United States agree to cease exports to the United States or revise their prices to eliminate all dumped sales. Following the publication of its preliminary dumping determination, however, Commerce entered into a second type of agreement found in 19 U.S.C. § 1673c(c) ("subsection (c) agreement"). Unlike subsection (b) agreements, the goal of subsection (c) agreements is not to eliminate all dumped sales. Rather, subsection (c) agreements seek to eliminate the *injurious effect* of exports of subject merchandise. 19 U.S.C. § 1673c(c)(1).

For the Department to enter into a subsection (c) agreement, "extraordinary circumstances" must be present. 19 U.S.C. § 1673c(c)(1). The statute defines extraordinary circumstances as those "in which . . . (i) suspension of an investigation will be more beneficial to the domestic industry than continuation of the investigation, and (ii) the investigation is complex." 19 U.S.C. § 1673c(c)(2)(A). An investigation is considered complex when either "(i) there are a large number

---

[5]      The 2013 Suspension Agreement was entered into pursuant to 19 U.S.C. § 1673c(c). For clarity, neither § 1673c(b) nor § 1673c(*l*) is applicable here. Subsection (b) governs agreements to eliminate all dumped sales; subsection (*l*) governs agreements with nonmarket economy countries.

of transactions to be investigated or adjustments to be considered, (ii) the issues raised are novel, or

(iii) the number of firms involved is large." 19 U.S.C. § 1673c(c)(2)(B).

Once Commerce determines that extraordinary circumstances are present, it may suspend

its investigation "upon the acceptance of an agreement to revise prices from exporters of the

subject merchandise who account for substantially all of the imports of that merchandise into the

United States," if certain conditions are met. 19 U.S.C. § 1673c(c)(1). Specifically, Commerce

may enter into a subsection (c) agreement if (1) "the agreement will eliminate completely the

injurious effect of exports to the United States of that merchandise," (2) "the suppression or

undercutting of price levels of domestic products by imports of that merchandise will be

prevented,"[6] and (3) dumping will not exceed a statutorily prescribed limit. *Id*. This last condition

provides that:

> for each entry of each exporter the amount by which the estimated normal value
> exceeds the export price (or the constructed export price) will not exceed 15 percent
> of the weighted average amount by which the estimated normal value exceeded the
> export price (or the constructed export price) for all [dumped] entries of the
> exporter examined during the course of the investigation.

19 U.S.C. § 1673c(c)(1)(B).

In other words, a significant feature of a subsection (c) agreement is that Commerce must

be satisfied that the agreement will prevent the "suppression or undercutting" of U.S. prices for the

domestic like product, and the estimated dumping margin of each entry of subject merchandise of

---

[6]      Notably, the effect of imports on domestic prices is a relevant factor in material injury determinations made by the United States International Trade Commission following the initiation of a dumping investigation. *See* 19 U.S.C. § 1677(7)(C)(ii). It is Commerce, however, that makes these findings when determining whether to enter into a suspension agreement under 19 U.S.C. § 1673c(c). *See* 19 U.S.C. § 1673c(c)(1)(A) (authorizing Commerce to enter into a suspension agreement "if . . . the suppression or undercutting of price levels of domestic products by imports of that merchandise will be prevented," and where certain other criteria are met).

each exporter will not exceed 15 percent of the weighted average dumping margin preliminarily determined for that exporter, or the all-others rate in the case of exporters that were not selected for individual examination by Commerce. Finally, Commerce may not enter into a suspension agreement of any kind unless "(1) it is satisfied that suspension of the investigation is in the public interest, and (2) effective monitoring of the agreement by the United States is practicable." 19 U.S.C. § 1673c(d).

Commerce may suspend an investigation only after considering the comments of the petitioner who sought the unfair trade investigation, and other interested parties. Thus, before an investigation may be suspended, Commerce must (1) "notify . . . and consult with the petitioner concerning, its intention to suspend the investigation, and notify other parties to the investigation and the [United States International Trade Commission (the "Commission" or "ITC")]"; (2) "provide a copy of the proposed agreement to the petitioner at the time of the notification, together with an explanation of how the agreement will be carried out and enforced, and of how the agreement will meet the requirements of . . . subsections . . . (c) and (d)"; and (3) "permit all interested parties . . . to submit comments and information for the record . . . ." 19 U.S.C. § 1673c(e)(1)-(3).

Even after an investigation has been suspended, interested parties have an ongoing role to play. For example, either exporters or domestic interested parties may ask Commerce to continue the suspended investigation. If Commerce receives a request for continuation of the investigation "within 20 days after the date of publication of the notice of suspension of an investigation" from "exporters accounting for a significant proportion of exports to the United States of the subject merchandise, or . . . an interested party . . . which is a party to the investigation, then [Commerce] and the Commission shall continue the investigation." 19 U.S.C. § 1673c(g). Additionally,

interested parties may request an annual review by Commerce of "the current status of, and compliance with, any agreement by reason of which an investigation was suspended, and review the amount of any . . . dumping margin involved in the agreement . . . ." 19 U.S.C. § 1675(a)(1)(C).

Last, for subsection (c) agreements, domestic interested parties are afforded an additional tool to secure compliance with the terms of the agreement by the foreign signatories and to ensure that the agreement is achieving its intended goal of eliminating the injurious effect of exports of subject merchandise: "Within 20 days after the suspension of an investigation[,] . . . an interested party which is a party to the investigation . . . may, by petition filed with the [ITC] and with notice to [Commerce], ask for a review of the suspension." 19 U.S.C. § 1673c(h)(1); *see Imperial Sugar Co. v. United States*, 40 CIT __, __, 181 F. Supp. 3d 1284, 1293 n.14 (2016), *appeal dismissed per agreement*, No. 17-1320 (Fed. Cir. May 31, 2017) (noting that the ITC determination under review was "the first time the Commission has been asked to review a suspension agreement pursuant to subsection (h)"). Following the receipt of such a petition, the ITC "shall, within 75 days after the date on which the petition is filed with it, determine whether the injurious effect of imports of the subject merchandise is eliminated completely by the agreement." 19 U.S.C. § 1673c(h)(2). Should the ITC make a negative determination, Commerce is directed to resume its investigation "on the date of publication of notice of such determination as if the affirmative preliminary determination . . . had been made on that date." 19 U.S.C. § 1673c(h)(2).

## BACKGROUND

The pertinent background facts are set out in the court's opinion in *Tomato Exchange I*, and are supplemented here.

## I.  SUSPENSION AGREEMENTS ON FRESH TOMATOES FROM MEXICO

In April 1996, in response to a petition filed by the Tomato Exchange and other domestic interested parties, Commerce and the ITC commenced their respective investigations of fresh tomatoes from Mexico that allegedly had been dumped in the United States. *See Fresh Tomatoes From Mexico*, 61 Fed. Reg. 18,377 (Dep't Commerce Apr. 25, 1996) (initiation of antidumping duty inv.).

In May 1996, the ITC made an affirmative preliminary injury determination, and so notified the Department. *See Fresh Tomatoes from Mexico*, USITC Pub. 2967, Inv. No. 731- TA-747 (May 1996) ("ITC Prelim. Injury Determination"); *Fresh Tomatoes From Mexico*, 61 Fed. Reg. 28,891 (ITC June 6, 1996) (prelim. determination).

Commerce proceeded with its antidumping investigation and, several months later, on October 28, 1996, preliminarily determined that fresh tomatoes from Mexico were being dumped in the United States during the period of investigation, *i.e.*, March 1, 1995 to February 29, 1996. *Fresh Tomatoes From Mexico*, 61 Fed. Reg. 56,608, 56,610 (Dep't Commerce Nov. 1, 1996) (affirmative prelim. dumping determination and postponement of final determination) ("Preliminary Determination"). Based on information supplied by the Mexican respondents during the investigation, Commerce calculated weighted-average dumping margins for several individual exporters, as well as an all-others rate, that ranged from 4.16 percent to 188.45 percent. *See* Preliminary Determination, 61 Fed. Reg. at 56,615.

On the same day the Preliminary Determination was issued, Commerce entered into a subsection (c) agreement with Mexican exporters accounting for substantially all fresh tomatoes imported into the United States from Mexico, thereby suspending the antidumping investigation. *Fresh Tomatoes From Mexico*, 61 Fed. Reg. 56,618, 56,619, App. I (Dep't Commerce Nov. 1,

1996) ("1996 Suspension Agreement" or "1996 Agreement"). In the 1996 Agreement, each exporter agreed that its tomatoes would be sold at or above an established reference price, and that, for each entry of subject merchandise, dumping would not exceed 15 percent of the weighted-average dumping margin preliminarily determined for that exporter in the antidumping investigation. *See* 1996 Suspension Agreement, 61 Fed. Reg. at 56,619, App. I, Section IV (Basis for the Agreement). Accordingly, Commerce determined that the 1996 Suspension Agreement would "(1) [e]liminate completely the injurious effect of exports to the United States of the subject merchandise; and (2) prevent the suppression or undercutting of price levels of domestic fresh tomatoes by imports of that merchandise from Mexico." 1996 Suspension Agreement, 61 Fed. Reg. at 56,618.

Over the course of approximately the next seventeen years, Commerce continued to suspend its antidumping investigation of fresh tomatoes from Mexico by way of subsection (c) agreements. Thus, in addition to the 1996 Agreement, Commerce entered into suspension agreements in 2002, 2008, and 2013. *See* 1996 Suspension Agreement, 61 Fed. Reg. at 56,619; *Fresh Tomatoes From Mexico*, 67 Fed. Reg. 77,044, 77,046 (Dep't Commerce Dec. 16, 2002); *Fresh Tomatoes From Mexico*, 73 Fed. Reg. 4831, 4833 (Dep't Commerce Jan. 28, 2008); 2013 Suspension Agreement, 78 Fed. Reg. at 14,968. Each of these agreements contained pledges by Mexican signatories to adhere to established minimum reference prices to prevent price suppression or undercutting and to limit dumping of subject merchandise to the level permitted by statute. Also, each agreement was determined by Commerce to eliminate completely the injurious effect of subject imports.

At issue in this case is the 2013 Suspension Agreement, pursuant to which the Mexican signatories pledged not to sell their tomatoes in the United States for less than established

reference prices in order to prevent price suppression or undercutting.[7] As in past agreements,

signatories also pledged to limit their dumping to permissible levels in accordance with 19

U.S.C. § 1673c(c)(1)(B).[8] *See* 2013 Suspension Agreement, 78 Fed. Reg. at 14,969. Appendices

A and B to the agreement set forth the reference prices and the methods used to calculate normal

value and export price. *See* 2013 Suspension Agreement, 78 Fed. Reg. at 14,972. The agreement

also contained provisions permitting Commerce and other government agencies to monitor and

enforce its terms and conditions. *See* 2013 Suspension Agreement, 78 Fed. Reg. at 14,969-71.

Accordingly, Commerce "determined that the 2013 Suspension Agreement [would] eliminate

completely the injurious effect of exports to the United States of the subject merchandise and

---

[7]     The agreement established both summer season and winter season reference prices for four categories of tomatoes: (1) open field and adapted environment, other than specialty (winter: $0.31 per pound; summer: $0.2458 per pound); (2) controlled environment, other than specialty (winter: $0.41 per pound; summer: $0.3251 per pound); (3) specialty—loose (winter: $0.45 per pound; summer: $0.3568 per pound); and (4) specialty—packed (winter: $0.59 per pound; summer: $0.4679 per pound). *See* 2013 Suspension Agreement, 78 Fed. Reg. at 14,972.

[8]     While Commerce has entered into relatively few subsection (c) agreements, previous agreements have included similar pledges. *See, e.g.*, *Sugar From Mexico*, 79 Fed. Reg. 78,039, 78,042 (Dep't Commerce Dec. 29, 2014) (suspension agreement) ("Each Signatory individually agrees that for each entry the amount by which the estimated normal value exceeds the export price (or the constructed export price) will not exceed 15 percent of the weighted average amount by which the estimated normal value exceeded the export price (or constructed export price) for all less-than-fair-value entries of the producer/exporter examined during the course of the investigation, in accordance with the Act and the Department's regulations and procedures, including but not limited to the calculation methodologies described in Appendix II of this Agreement."); *Potassium Chloride From Canada*, 53 Fed. Reg. 1393, 1394 (Dep't Commerce Jan. 19, 1988) ("In order to satisfy the requirements of section 734(c) of the Act, each signatory producer/exporter of potassium chloride from Canada, individually, agrees that the price it will charge for each entry of potassium chloride exported to the United States from Canada for consumption in the United States will be such that any amount by which the estimated foreign market value exceeds the United States price will not exceed 15 percent of the weighted-average amount by which the estimated foreign market value exceeded the United States price for all less-than-fair-value entries by such signatory producer/exporter that were examined during the Department's investigation.").

prevent the suppression or undercutting of price levels of domestic fresh tomatoes by imports of

that merchandise from Mexico." 2013 Suspension Agreement, 78 Fed. Reg. at 14,968.


## II.   THE COURT'S OPINION IN *TOMATO EXCHANGE I*

In *Tomato Exchange I*, the court agreed with plaintiff that the Tomato Exchange was

"depriv[ed] . . . of procedural rights afforded to it by the suspension agreement statute" because

Commerce failed to make two of the three explanatory memoranda on the record regarding

extraordinary circumstances, price suppression, and the public interest (the "Explanatory

Memoranda")[9] available until after it had entered into the 2013 Suspension Agreement. *Tomato*

*Exchange I*, 39 CIT at __, 107 F. Supp. 3d at 1354. Holding that Commerce's failure to comply

with the statute's notice, comment, and consultation requirements compelled remand, the court

directed the Department to reopen the record, afford plaintiff the opportunity to comment on

Commerce's determinations in the Explanatory Memoranda, consult with plaintiff about the

comments if appropriate, and make any appropriate revisions to the agreement after giving

meaningful consideration to plaintiff's arguments. *Id.* at __, 107 F. Supp. 3d at 1354-56.


## III.   THE REMAND RESULTS

On remand, Commerce invited interested parties to comment on the Explanatory

Memoranda in accordance with the court's instructions in *Tomato Exchange I.* Remand Results

at 6. In response to a request by plaintiff, Commerce placed on the record the United States

---

[9]      The Explanatory Memoranda are: (1) the "Extraordinary Circumstances
Memorandum," P.R. 4 at bar code 3413166-04 (Mar. 4, 2013); (2) the "Price Suppression
Memorandum," P.R. 5 at bar code 3413166-05 (Apr. 18, 2013); and (3) the "Public Interest
Memorandum," P.R. 3 at bar code 3413166-03 (Mar. 4, 2013).

Department of Agriculture's ("USDA") Tomato Fax Report, which contained data for the 2008 –

2009, 2009 – 2010, and 2010 – 2011 growing seasons—data that Commerce had examined

previously in the Price Suppression Memorandum. *See* Remand Results at 6.

Commerce received comments on the Explanatory Memoranda from one domestic

interested party—plaintiff, the Tomato Exchange. Commerce also received comments from one

Mexican exporter based in the United States, and the Mexican signatories to the 2013

Suspension Agreement. Additionally, the Mexican signatories and the Tomato Exchange

requested consultations with Commerce.[10] *See* Remand Results at 6-7.

After these consultations, and having considered the parties' comments on the

Explanatory Memoranda, Commerce produced a draft of the remand results and invited

comments. Upon consideration of comments received on the draft, Commerce concluded that the

2013 Suspension Agreement as previously drafted met the requirements of § 1673c(c) and (d)

and that no revisions to the agreement were necessary. *See* Remand Results at 7-8.


## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B)(i).

---

[10]     There is no dispute that on remand Commerce complied with the notice, comment, and consultation requirements of 19 U.S.C. § 1673c(e) in accordance with the court's order in *Tomato Exchange I.*

## DISCUSSION

Central to Commerce's decision to enter into the 2013 Suspension Agreement were its determinations that the agreement would (1) limit dumping, on an entry-by-entry basis, to no more than 15 percent of the weighted-average dumping margins preliminarily determined during the investigation; and (2) prevent price suppression or undercutting through the use of minimum reference prices. Remand Results at 58, 41. For the reasons that follow, the court sustains the Department's determination that the 2013 Agreement would limit dumping to the level permitted by statute, but remands for further explanation its determination that the agreement would prevent price suppression or undercutting. Since Commerce's price suppression determination formed the basis of its "injurious effect" determination and, in part, its "extraordinary circumstances" determination, Commerce's explanation will necessarily affect those determinations, too.

## I.   LIMITATION OF DUMPING IN ACCORDANCE WITH 19 U.S.C. § 1673C(C)(1)(B)

Commerce may enter into a subsection (c) agreement if it will limit dumping as provided in 19 U.S.C. § 1673c(c)(1)(B). *See* 19 U.S.C. § 1673c(c)(1)(B) (stating, as a condition to entering into a subsection (c) agreement, that "for each entry of each exporter the amount by which the estimated normal value exceeds the export price (or the constructed export price) will not exceed 15 percent" of the weighted average dumping margins determined in the investigation). As the parties acknowledge, § 1673c(c) is silent as to the particular method that Commerce must use to determine whether § 1673c(c)(1)(B) is satisfied. *See* Pl.'s Cmts. 7 (acknowledging that the statute does "not direct Commerce to use a particular method to determine the level of dumping" under a subsection (c) agreement); Def.'s Resp. Cmts. 18

(noting that "the statute is silent with respect to the method by which Commerce may [determine

whether § 1673c(c)(1)(B) is satisfied]"). This being the case, the court will uphold Commerce's

method so long as it is "sufficiently reasonable" and consistent with congressional intent,

"giv[ing] due weight to the agency's interpretation of the statute it administers . . . ." *Ipsco, Inc.*

*v. United States*, 899 F.2d 1192, 1194-95 (Fed. Cir. 1990) (internal quotation marks and citations

omitted); *see also Parkdale Intern., Ltd. v. United States*, 31 CIT 1229, 1245, 508 F. Supp. 2d

1338, 1355 (2007) ("Commerce has authority to fill gaps in a legislative scheme it is entrusted to

administer, even where Congress has not provided a direct statement delegating rulemaking

authority." (citing *Viraj Group v. United States*, 476 F.3d 1349, 1357 (Fed. Cir. 2007)).

Here, Commerce determined that the 2013 Suspension Agreement satisfied the

requirements of § 1673c(c)(1)(B) by relying on a particular provision of the agreement—the

pledge made by the exporters:

> In order to satisfy the requirements of [19 U.S.C. § 1673c(c)(1)(B)], each
> signatory individually agrees that for each entry the amount by which the
> estimated normal value exceeds the export price (or the constructed export price)
> will not exceed 15 percent of the weighted average amount by which the
> estimated normal value exceeded the export price (or the constructed export price)
> for all less-than-fair-value entries of the producer/exporter examined during the
> course of the investigation, in accordance with the Act and the Department's
> regulations and procedures, including but not limited to the calculation
> methodologies described in Appendix B of this Agreement.

2013 Suspension Agreement, 78 Fed. Reg. at 14,969. When deciding to rely on the pledge

(rather than some other mechanism or standard), Commerce noted that an "extensive length of

time" had passed between Commerce's 1996 antidumping investigation and the negotiation of

the 2013 Agreement, and the absence of contemporaneous information on the record regarding

whether Mexican tomato sales in the intervening years had complied with § 1673c(c)(1)(B):

> The record does not include information regarding the level of dumping at which
> subject merchandise sales were made in the year(s) prior to and around the time

that negotiations regarding the 2013 Suspension Agreement occurred, and no such evidence was submitted during this remand proceeding. As such, the Department continues to find that an enforceable pledge by the signatory producers/exporters to ensure that each and every one of their sales is made in accordance with [19 U.S.C. § 1673c(c)(1)(B)] is a reasonable basis to determine that the 2013 Suspension Agreement meets this statutory requirement.

Remand Results at 58-59.

In addition to relying on the pledge, Commerce cited various provisions under section IV (Monitoring of the Agreement) and section V (Violations of the Agreement) of the 2013 Suspension Agreement that authorize the Department to monitor compliance by the signatories with the limitation on dumping in § 1673c(c)(1)(B). *See* Remand Results at 59, 73-75.

Importantly, the Department also found that the absence of any evidence in the record of dumping by the Mexican growers and exporters in excess of permitted levels under the 1996, 2002, and 2008 suspension agreements, which contained similar pledges, supported the reasonableness of its reliance on the pledge in the 2013 Agreement. *See* Remand Results at 53 ("[T]here was no available evidence, including on the record of the 2008 Suspension Agreement, indicating that the Mexican tomato growers/exporters made sales at prices exceeding the permitted level of dumping . . . ."). Commerce further noted that no interested party has asked the Department to continue its antidumping investigation, or perform an administrative review of the 2013 Agreement (or any of the prior agreements) to determine whether sales of subject merchandise were exceeding permissible dumping levels. *See* Remand Results at 53 ("[N]o interested party ha[s] ever requested an administrative review of the prior agreements . . . to determine whether sales of Mexican tomatoes were in compliance with [19 U.S.C. § 1673c(c)(1)(B)].").

Despite acknowledging the statute's silence on any particular method that Commerce must apply to determine whether § 1673c(c)(1)(B) is satisfied, plaintiff insists that Commerce

had a "duty to investigate" the level of dumping that would be eliminated by the 2013 Agreement. *See* Pl.'s Cmts. 4 ("Commerce has continued to refuse to make even a perfunctory investigation into the level of dumping that will occur under the [2013] Suspension Agreement."), 6 (referring to Commerce's "abdication of its duty to investigate"), 11-12 (referring Commerce's "duty to investigate"). Plaintiff's main argument is that Commerce improperly delegated this duty to investigate to the Mexican signatories by relying on the pledge in the 2013 Agreement. According to plaintiff, since "Commerce has collected no data to support any determination on the level of dumping under the 2013 Suspension Agreement, . . . [the] determination cannot be held to be supported by substantial evidence." Pl.'s Cmts. 7.

The Tomato Exchange attempts to bolster its argument with case law. Specifically, it relies on *Timken Co. v. United States*, 10 CIT 86, 630 F. Supp. 1327 (1986) as support for the proposition that Commerce was required to collect data on whether the agreement would limit dumping to permissible levels. Pl.'s Cmts. 12 ("'The burden of ensuring such up-to-date review should not rest upon a domestic party. Antidumping proceedings are investigatory, not adjudicatory.'" (quoting *Timken*, 10 CIT at 92, 630 F. Supp. at 1333)). Plaintiff also cites this Court's decisions in *Rhone-Poulenc, Inc. v. United States*, 20 CIT 573, 927 F. Supp. 451 (1996) and *Weiland-Werke AG v. United States*, 22 CIT 129, 4 F. Supp. 2d 1207 (1998), among others.

These cases, however, are not persuasive on the issue presented here. *Timken* does not address Commerce's obligations under § 1673c(c). Rather, *Timken* discusses Commerce's obligation to gather information in the context of a periodic review of an antidumping duty order. *Timken*, 10 CIT at 92, 630 F. Supp. at 1333 ("The responsibility for making findings pursuant to [19 U.S.C. § 1675 (1982), as amended] rests upon [Commerce]."). Likewise, *Rhone-Poulenc* was a challenge to Commerce's final affirmative dumping determination in a nonmarket

economy case, and *Weiland-Werke* was a challenge to Commerce's final decision not to revoke

an antidumping order in the context of a periodic review. In each of these cases, Commerce was

looking backward in time, at sales made during a particular period in the past, for use in

calculating dumping margins. The record in each of these cases, then, could be compiled using

facts already in existence.

By way of contrast, when determining whether 19 U.S.C. § 1673c(c)(1)(B) is satisfied,

Commerce's perspective is forward-looking. This is borne out by the language of the statute,

which is put in the future tense. *See* 19 U.S.C. § 1673c(c)(1)(B) ("[T]he amount by which the

estimated normal value exceeds the export price . . . *will* not exceed 15 percent . . . .") (emphasis

added); *see also id*. § 1673c(c)(1) ("[T]he agreement *will* eliminate completely the injurious

effect of exports to the United States . . . .") (emphasis added); *id*. § 1673c(c)(1)(A) ("[T]he

suppression or undercutting of price levels of domestic products by imports of that merchandise

*will* be prevented . . . .") (emphasis added). The facts about future dumping are, of course, not

known now. Thus, the reasoning found in the cases cited by plaintiff has no application here.

Further, it is difficult to credit plaintiff's "duty to investigate" where the statute itself

provided a number of ways for interested parties to ask Commerce to investigate, once the 2013

Agreement had gone into effect and the facts of any dumping during its term could be

established; none of which the Tomato Exchange has availed itself of. As noted by Commerce,

neither the Tomato Exchange nor any other domestic interested party asked the Department to

continue its antidumping investigation, under 19 U.S.C. § 1673c(g), or conduct an annual

review, under 19 U.S.C. § 1675(a)(1)(C); nor has the Tomato Exchange petitioned the ITC to

review the suspension, under 19 U.S.C. § 1673c(h)(1). *See* Remand Results at 53.

Because there is nothing in the law placing on Commerce a "duty to investigate," and in light of the history of earlier agreements, the availability of measures to monitor and enforce the 2013 Agreement, and the statute's silence as to any particular method that Commerce must use to determine whether a suspension agreement will limit dumping to the level permitted by § 1673c(c)(1)(B), the Department's decision to rely on the exporters' pledge in the 2013 Agreement is in accordance with law. That is, the method chosen by Commerce is "sufficiently reasonable" and consistent with Congress' intent that suspension agreements be used "as a means of achieving the remedial purposes of the [antidumping] law in as short a time as possible and with a minimum expenditure of resources by all parties involved." H.R. Rep. No. 96-317, at 53; *see also PPG Indus., Inc.*, 11 CIT at 355, 662 F. Supp. at 267 ("A separate investigation of [each exporter] would have impermissibly expanded the scope and duration of the investigation and violated congressional desire that suspension agreements lead to rapid resolution of the issues."). Moreover, in light of the exporters' apparent compliance with earlier pledges coupled with the lack of contemporaneous evidence in the record regarding dumping levels, the Department's decision is supported by substantial evidence. Accordingly, Commerce's conclusion that the agreement satisfied the requirements of 19 U.S.C. § 1673c(c)(1)(B) is sustained.

II. **PREVENTION OF PRICE SUPPRESSION OR UNDERCUTTING AND THE ELIMINATION OF INJURIOUS EFFECT OF IMPORTS**

Commerce may enter into a subsection (c) agreement if it determines that, under the agreement, "the suppression or undercutting of price levels of domestic products by imports of that merchandise will be prevented . . . ." 19 U.S.C. § 1673c(c)(1)(A). Neither "suppression" nor "undercutting" is defined by the statute or Commerce's regulations.

In the absence of a statutory or regulatory definition, Commerce sought to interpret the phrase "suppression or undercutting" in § 1673c(c)(1)(A).  To do so, Commerce looked to the statutes governing the ITC's determinations of material injury and threat of material injury for guidance. *See* 19 U.S.C. § 1677(7)(C) (material injury determination), § 1677(7)(F) (threat determination). These statutes require the ITC to consider the effects of imports on U.S. prices when making its injury determinations. Commerce analyzed the pertinent provisions of 19 U.S.C. § 1677(7) in the Price Suppression Memorandum to arrive at a definition of "suppression or undercutting":

> [I]n developing a reasonable definition of price suppression or undercutting, it is instructive to examine [19 U.S.C. § 1677(7)], which references price suppression and undercutting[11] in setting out the procedures that the [ITC] must follow in making its material injury determinations.
>
> Section [1677(7)(C)] directs the ITC to consider various factors when determining whether a domestic industry is materially injured by imports of merchandise subject to investigation, among which is price:
>
> > (ii)   Price -- In evaluating the effect of imports of such merchandise on prices, the {ITC} shall consider whether --
> >
> > > (I)   there has been significant price underselling by the imported merchandise as compared with the price of like products of the United States, and

---

[11]    The term "undercutting" is not found in the material injury or threat provisions of 19 U.S.C. § 1677(7). However, the term "underselling," does appear in the material injury provision. *See* 19 U.S.C. § 1677(7)(C)(ii)(I) ("In evaluating the effect of imports of [subject] merchandise on prices, the Commission shall consider whether . . . there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States . . . ."). The dictionary definitions of "undercutting" and "underselling" indicate these words have similar meanings. *Compare* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1945 (3d ed. 1996) (defining "undercut" as "[t]o sell at a lower price than . . . a competitor . . ."), *with id.* at 1947 (defining "undersell" as "[t]o sell goods at a lower price than . . . another seller . . ."). While Commerce does not offer its own interpretation of "undercutting," as it appears in § 1673c(c)(1)(A), it seems to use the terms "undercutting" and "underselling" interchangeably. *See* Price Suppression Memorandum at 2-3.

> (II)   the effect of imports of such merchandise otherwise <u>depresses prices</u> to a significant degree <u>or prevents price increases</u>, <u>which otherwise would have occurred</u>, to a significant degree.
>
> Similarly, when the ITC analyzes the <u>threat</u> of material injury, it considers, among other factors, "whether imports of the subject merchandise are entering {the United States} at prices that are likely to have a significant <u>depressing or suppressing</u> effect on domestic prices, and are likely to increase demand for further imports . . . ." <u>See</u> [19 U.S.C. § 1677(7)(F)(i)(IV)].
>
> Assuming that subsections [1677(7)(C)(ii) and 1677(7)(F)(i)(IV)] were intended to be parallel, a comparison of the phrase "depressing or suppressing" in subsection [1677(7)(F)(i)(IV)] to "depresses prices . . . or prevents price increases which otherwise would have occurred" in subsection [1677(7)(C)(ii)(II)] indicates that price *"suppression" generally encompasses practices and impacts which prevent price increases which otherwise would have occurred.* The legislative history to section [1677(7)(C)] supports such an interpretation. The Senate Report, for example, states that the ITC "would consider whether there has been significant price undercutting . . . and whether such imports have <u>depressed or suppressed</u> such prices to a significant degree." S. Rep. 96-249 at 87, reprinted in 1979 U.S.C.C.A.N. 381, 473 (1979).
>
> Assuming that a reasonable interpretation of the term "suppression" in section [1673c(c)] is the "prevent{ion of} price increases which otherwise would have occurred," *the Department may enter into a [subsection (c) agreement] if it determines,* <u>inter</u> <u>alia,</u> *that imports of the subject merchandise allowed under the agreement will not prevent price increases, or undercut price levels of the affected domestic products.*

Price Suppression Memorandum at 2-3 (underscoring and braces in original; italics and brackets added).

Applying this rationale, Commerce concluded that the reference prices in the 2013 Suspension Agreement would prevent the suppression or undercutting of domestic U.S. tomato prices by imports of Mexican tomatoes and thereby eliminate the injurious effect of those imports. *See* Remand Results at 30 (determining that the 2013 Suspension Agreement "eliminates injurious effects [of imports] because . . . the [agreement's] reference prices

eliminate price suppression or undercutting"). Commerce based this conclusion on information in the USDA's Tomato Fax Report.

With the Tomato Fax Report as a reference, the Department first considered the relative pricing structure of the four tomato categories covered by the 2013 Suspension Agreement: (1) open field and adapted environment, other than specialty ("open field"); (2) controlled environment, other than specialty; (3) specialty—loose; and (4) specialty—packed. In doing so, Commerce examined Mexican and U.S. prices for each category during the 2008 – 2012 winter seasons and observed that "open field tomatoes were consistently priced below other tomatoes, and that packed specialty tomatoes were higher-priced than loose specialty tomatoes . . . in all years analyzed . . . and through all the price variations that characterize this market." Price Suppression Memorandum at 3. Thus, Commerce found that "elimination and prevention of price suppression within the meaning of [19 U.S.C. § 1673c(c)(1)(A)] require[d] that the entire relative price structure be raised to a sufficiently high level" to prevent price suppression. Price Suppression Memorandum at 4. Since the relative price structure was "reasonably stable and [gave] rise to a consistent rank ordering of the prices for open field and adapted environment, controlled environment, specialty loose and specialty packed tomatoes," Commerce determined that "raising the structure . . . to a sufficiently high level require[d] only that the lowest price in the structure [*i.e.*, the winter reference price for open field tomatoes] be raised to a sufficiently high level." Price Suppression Memorandum at 4. In other words, for Commerce, it had only to establish a "sufficiently high" winter reference price for open field tomatoes, based on which it would then calculate reference prices for each of the other three tomato categories.

Next, to construct a price for open field tomatoes that would be at a "sufficiently high" level, Commerce examined pricing data for U.S. and Mexican tomatoes sold in the United States

during the winter seasons of 2008 – 2012—years when the 2008 suspension agreement was in effect. Commerce found that "relative to the other years, the average winter season prices for all tomato types reported in the <u>Tomato Fax Report</u> were at their *lowest* during the 2011 – 2012 winter season."   Price Suppression Memorandum at 4 (emphasis added).   Additionally, Commerce found that during the 2011 – 2012 winter season, which ran from October 2011 – June 2012, "the prices for open field tomatoes were at the minimum reference price for sustained periods of time," (*i.e.*, the reference price found in the 2008 suspension agreement of $0.2169 per pound) and that, as a result, U.S. tomato prices were suppressed. *See* Price Suppression Memorandum at 4; Remand Results at 43.

The Price Suppression Memorandum illustrates average open field tomato prices during the 2011 – 2012 winter season in U.S. dollars per pound as follows:

|  | 2011/2012 | |
|---|---|---|
|  | Florida | Mexico |
| Oct-11 | 0.4391 | - |
| Nov-11 | 0.4547 | 0.4817 |
| Dec-11 | 0.2928 | 0.4145 |
| Jan-12 | 0.2779 | 0.2614 |
| Feb-12 | 0.2914 | 0.2432 |
| Mar-12 | 0.3883 | 0.3186 |
| Apr-12 | 0.2537 | 0.2270 |
| May-12 | 0.3370 | 0.2609 |
| Jun-12 | 0.4338 | 0.4335 |
| **Simple Average Price for the Period** | **0.3387** | **0.3008** |

Price Suppression Memorandum, Attach. Based on this price information, Commerce found

> that the average daily prices for Mexican open field tomatoes were lower than the average daily prices for U.S. open field tomatoes during the 2011 – 2012 winter season. The simple daily average price for the 2011 – 2012 winter season was $0.3008 per pound for Mexican tomatoes and $0.3387 per pound for U.S. tomatoes . . . .

Price Suppression Memorandum at 5. Thus, Commerce concluded:

> In light of the sustained pricing of open field tomatoes at the minimum reference price and the price suppressive effects of such pricing, we chose the 2011 – 2012 winter season as the period for which to determine reference prices that adequately prevent price suppression or undercutting.

Price Suppression Memorandum at 5. In other words, Commerce chose the 2011 – 2012 winter season because it was a period when tomato prices from both Mexico and the United States were at their lowest for sustained periods, and when Mexican tomatoes were sold at lower prices than U.S. tomatoes. The Department then determined, as a new base reference price, one that would have "adequately" prevented suppression or undercutting during the 2011 – 2012 winter season.

By way of explanation, Commerce stated that it sought to find a reference price for the lowest price tomatoes (open field) that would achieve a "closer correlation" between Mexican and U.S. prices:

> [W]e examined the calculation of the simple average of the Mexican import prices for open field tomatoes for the season to determine the price to which the lowest Mexican prices would need to rise to bring about a *closer correlation* between Mexican and U.S. prices. We found that we could achieve that correlation if the lowest Mexican daily prices were raised to $0.31 per pound. Specifically, in those instances where the average Mexican import price for a particular day was less than $0.31, we set the Mexican import price to $0.31. Using the minimum price of $0.31, we then recalculated the simple average Mexican price for the season. We found that the simple average of the Mexican daily prices using the $0.31 per pound minimum price resulted in a simple average of daily prices of $0.3473 per pound.

Price Suppression Memorandum at 5 (emphasis added). Applying its rationale that it may enter into a subsection (c) agreement "if it determines, inter alia, that imports of the subject merchandise allowed under the agreement will not prevent price increases, or undercut price levels of the affected domestic products," Commerce then "determined that price suppression or undercutting of prices for U.S. open field tomatoes . . . would have been prevented in the 2011 – 2012 winter season at a reference price of $0.31 per pound." Price Suppression Memorandum

at 3, 5; *see also* Remand Results at 45. The new reference price of $0.31 per pound for open field tomatoes set the floor for the winter and summer reference prices of the other categories of tomatoes covered by the agreement.[12] *See* Price Suppression Memorandum at 5; Remand Results at 35 (setting out winter reference prices for controlled environment, specialty loose tomatoes, and specialty packed tomatoes at $0.41 per pound, $0.45 per pound, and $0.59 per pound, respectively).

Plaintiff does not challenge Commerce's interpretation of the term "suppression" in § 1673c(c)(1)(A), *i.e.*, the "prevent[ion of] price increases which otherwise would have occurred." Price Suppression Memorandum at 3. Nor does there appear to be any dispute regarding the meaning of the term "undercutting," *i.e.*, the selling of imports at lower prices than the domestic like product. Rather, plaintiff argues that Commerce's conclusion that the new reference price of $0.31 per pound would prevent price suppression is unsupported by substantial evidence because Commerce unreasonably used the suppressed prices of the 2011 – 2012 winter season to determine the sufficiency of the reference price. *See* Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 30, 35 ("Commerce[] . . . only addresses how adherence to the 2013 reference price would have raised import prices in the 2011-12 'winter' season to a point where, on average, they would no longer have undercut U.S. prices. Even accepting, *arguendo*, that this sufficiently addresses the prevention of price *undercutting*, Commerce's reasoning does not at all support a

---

[12]     Commerce determined summer reference prices for each category of tomato "by applying the price differential between the summer and winter reference prices in the 2008 Suspension Agreement – 79.29 percent – to winter reference prices it had determined [for] each category." Remand Results at 35 (setting out summer reference prices of $0.2458 per pound for open field and adapted environment tomatoes, other than specialty; $0.3251 per pound for controlled environment tomatoes, other than specialty; $0.3568 per pound for specialty loose tomatoes; and $0.4679 per pound for specialty packed tomatoes).

conclusion that price *suppression* will be prevented.”). Put another way, plaintiff insists that the price for U.S. tomatoes, used as the point of comparison with the Mexican prices, was itself depressed. For plaintiff, Commerce’s determination that $0.31 per pound was a sufficiently high reference price because it would have raised the average Mexican tomato price to $0.3473 per pound, and therefore have permitted the price of U.S. tomatoes to rise from $0.3387 per pound to the Mexican level, would not prevent future price suppression. Rather, it would merely raise the price of Mexican tomatoes to a higher, but still low, price—a price that would not permit U.S. producers to raise their prices to unsuppressed levels. *See* Pl.’s Cmts. 19 (“By setting a reference price not intended to increase average seasons prices beyond that highly injurious 2011-2012 season average price, but instead specifically calculated to raise price levels only to that point, Commerce not only failed to prevent price suppression with the 2013 Suspension Agreement, but also failed to assure the Agreement performed the fundamental function of a [subsection (c)] agreement: to eliminate injurious effect.”).

     As an initial matter, the court finds reasonable the method used by Commerce to establish a relative pricing structure for the four categories of tomatoes covered by the 2013 Agreement. That is, using information from the Tomato Fax Report to establish what Mexican and U.S. prices were during a particular period and then calculating a floor price that would permit U.S. producers to raise their prices was reasonable. The court also finds reasonable the method used by Commerce to calculate a base reference price high enough to prevent price suppression or undercutting. Specifically, the court finds that raising the lowest price in the relative pricing structure enough to achieve a “closer correlation” between average U.S. and Mexican prices for all categories of tomatoes covered by the agreement was reasonable.

The court agrees with plaintiff, however, that Commerce has failed to support with substantial evidence its determination that suppression or undercutting of U.S. price levels would be prevented by the 2013 Suspension Agreement. That is, it is difficult to understand how Commerce reasonably could have concluded that the new base reference price would have been sufficiently high to prevent price suppression or undercutting based on the evidence on which it relied. The determination of whether the $0.31 per pound price was sufficiently high was based on a comparison of what the average daily price of Mexican tomatoes would have been if sales were made at $0.31 (*i.e.*, $0.3473 per pound) with low U.S. prices.

Although not required to do so, Commerce chose to look retrospectively to determine a new reference price. The chosen period, the 2011 – 2012 winter season, was especially challenging for the domestic industry. It was a season that, according to plaintiff, led to an attempt by the domestic industry to withdraw its petition, terminate the investigation, and terminate the 2008 suspension agreement. Pl.'s Cmts. 18 ("Due to the financial ruin of the 2011-2012 season domestic producers sought to terminate the investigation entirely as it no longer offered them protection from unfairly traded imports."). Indeed, Commerce itself stated that in the winter season of 2011 – 2012 Mexican tomato prices were at the minimum reference price for prolonged periods, relative to other years, which suppressed U.S. prices. *See* Remand Results at 43.

Commerce's entire explanation for why it chose the 2011 – 2012 winter season is as follows:

> As explained in the Price Suppression Memo, the Department determined the prices for open field tomatoes were at the 2008 Suspension Agreement winter reference price ($0.2169/lb.) for sustained periods of time during the 2011 – 2012 winter season, and that this had price suppressive effects in the U.S. tomato market. While sales made at the reference price are made in accordance with the terms of a [subsection (c) agreement], we find that it is <u>sustained</u> periods of sales

at the reference price that can cause price suppression, as occurred in the 2011 – 2012 winter season. In a typical season there are periods when [sales] are made at the reference price, however usually sales are not made at the reference price for prolonged periods of time. When [sales] are made at the reference price over a significant period of time price increases may be less likely and may lead to suppressed prices. This can clearly be seen by examining *Tomato Fax Report* data. For example, from March 22, 2012 through May 10, 2012, the average daily price of imports from Mexico was at or close to the then-current reference price of $0.2169/lb. and all of those imports were at or below the current reference price of $0.31/lb. The average price of imported Mexican tomatoes in April 2012 was $0.227/lb. In contrast, while some sales were made at or below the reference price during the same period of the 2009 – 2011 winter seasons, sales at the reference price were not made for sustained periods of time. The average prices of Mexican imports in April of those seasons were also markedly higher; in April 2010 the average price of Mexican imports was $0.5247/lb. and in April 2011 they were $0.95/lb. In all years we examined, sales were made at various points at the reference price in effect at the time, however, the Department determined that it was the *prolonged* periods of sales at the reference price that suppressed prices. The price-suppressive pressure felt by the entire domestic tomato industry culminated in the domestic producers' request to withdraw the petition and terminate the suspended investigation.

Remand Results at 43-44 (emphasis in original). This explanation falls short of supporting Commerce's determination that "[the 2013 Agreement's] references prices eliminate price suppression or undercutting" in the following respects. Remand Results at 30.

First, Commerce seems to believe, based on its observations that (1) Mexican prices were at or near the 2008 reference price ($0.2169 per pound) for sustained periods during the 2011 – 2012 winter season, (2) during the same period, U.S. prices were at their lowest for the period examined, and (3) U.S. prices necessarily were suppressed during the 2011 – 2012 winter season. However, merely observing Mexican prices at the 2008 reference level and low U.S. prices does not constitute an explanation. That is, observations do not constitute reasons. At best Commerce's explanation, and the evidence that supports it, merely demonstrates that, in a very bad year, U.S. growers would not have been prevented from raising their prices had the reference price been $0.31 per pound. Therefore, there is nothing in the explanation that would tend to

demonstrate that the U.S. prices, were they to rise to the hypothetical Mexican price ($0.3473 per pound), would not be suppressed or that there would not be undercutting during the term of the 2013 Suspension Agreement.

Second, Commerce does not offer an explanation as to how setting a reference price that would result in average U.S. prices being only marginally higher than concededly low average U.S. suppressed prices achieves the statutory goal of preventing price suppression or undercutting. 19 U.S.C. § 1673c(c)(1)(A). In particular, Commerce does not cite to substantial evidence tending to demonstrate that prices calculated using, as a point of comparison, a growing season of low prices would prevent price suppression or undercutting going forward.

Finally, Commerce does not say why prices were not suppressed during the other winter seasons. In other words, Commerce does not marshal evidence that says why the 2011 – 2012 winter season was a superior choice as a point of comparison than the winter seasons of other years or a combination of years.

Accordingly, remand is appropriate so that Commerce may explain, in accordance with this Opinion and Order, its determination that suppression or undercutting of U.S. tomato prices will be prevented under the 2013 Agreement and support its redetermination on remand with substantial record evidence. In doing so, Commerce may wish to take a page from the ITC's preliminary injury determination. There, the ITC considered U.S. and Mexican monthly average prices and margins of overselling and underselling spanning a three-year period when preliminarily determining the price effects of subject imports. *See* ITC Prelim. Injury Determination at 29 (citing Part V (pricing data covered the period January 1993 – February 1996)).

**CONCLUSION**

Based on the foregoing, it is hereby

**ORDERED** that Commerce's Remand Results are remanded; it is further

**ORDERED** that, on remand, Commerce shall issue a redetermination that complies in all respects with this Opinion and Order, is based on determinations that are supported by substantial record evidence, and is in all respects in accordance with law; it is further

**ORDERED** that, on remand, should Commerce continue to find that sustained periods of sales of Mexican tomatoes at or near the 2008 reference price ($0.2169 per pound) supports its decision to choose the 2011 – 2012 winter season as the time period to compare Mexican and U.S. prices, Commerce must cite substantial record evidence demonstrating that U.S. prices, were they to rise to the hypothetical Mexican price ($0.3473 per pound), would not be suppressed or that there would not be undercutting during the term of the 2013 Suspension Agreement; it is further

**ORDERED** that, on remand, Commerce must cite to substantial evidence tending to demonstrate that prices calculated using as a point of comparison a growing season of low prices would prevent price suppression or undercutting during the course of the 2013 Suspension Agreement in order to explain how setting a reference price that is marginally higher than an average U.S. suppressed price achieves the statutory goal of preventing price suppression or undercutting; it is further

**ORDERED** that, on remand, Commerce must examine whether prices were not suppressed during the other winter seasons. That is, Commerce must cite substantial evidence demonstrating why the 2011 – 2012 winter season was superior to the winter seasons of other years or a combination of years; it is further

**ORDERED** that, on remand, Commerce must support with substantial evidence its conclusion that the reference price will prevent suppression or undercutting and, thereby, "eliminate completely the injurious effect of exports to the United States" of Mexican tomatoes, pursuant to 19 U.S.C. § 1673c(c)(1). In doing so, Commerce may wish to take into consideration the ITC's preliminary injury determination, in which the ITC considered U.S. and Mexican monthly average prices and margins of overselling and underselling spanning a three-year period when determining the price effects of subject imports; it is further

**ORDERED** that, on remand, Commerce is directed to reconsider, in light of its determinations with respect to price suppression and injurious effect, its determination that "suspension of [the] investigation will be more beneficial to the domestic industry than continuation of the investigation," pursuant to 19 U.S.C. § 1673c(c)(2)(A)(i); it is further

**ORDERED** that Commerce may reopen the record to solicit additional information required to make these determinations or otherwise complete its analysis; and it is further

**ORDERED** that the remand results shall be due ninety (90) days from the date of this Opinion and Order; comments to the remand results shall be due thirty (30) days following filing of the remand results; and replies to such comments shall be due thirty (30) days following filing of the comments.

                                                         _____/s/ Richard K. Eaton____
                                                              Richard K. Eaton, Judge

Dated:   August 25, 2017
            New York, New York